PCS Phosphate Co. v. Jacobs Eng'g Grp., Inc., 2026 NCBC 21.

STATE OF NORTH CAROLINA

BEAUFORT COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV000227-060

PCS PHOSPHATE COMPANY, INC.
and PCS ADMINISTRATION (USA),
INC.,

Plaintiffs,

v.

JACOBS ENGINEERING GROUP,
INC. and BUSS CHEMTECH AG,

Defendants.

**ORDER AND OPINION ON
DEFENDANT JACOBS
ENGINEERING GROUP, INC.'S
MOTION TO DISMISS**

1. This matter is before the Court on the Rule 12(b)(6) motion of defendant Jacobs Engineering Group, Inc. to dismiss the amended complaint filed by plaintiffs PCS Phosphate Company, Inc. and PCS Administration (USA), Inc. (ECF No. 57).

2. In their complaint, Plaintiffs assert causes of action against Jacobs for (i) breach of contract, (ii) breach of warranty, and (iii) professional negligence. (*See generally* ECF No. 42).

3. Having considered the amended complaint, the written and oral arguments of counsel, and applicable law, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Jacobs's motion for the reasons set forth in this Order and Opinion.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Joseph A. Ponzi, Harold Arthur Bolick, Christopher B. Dodd, and Gabrielle E. Supak, and King & Spalding, LLP by Adam Gray for Plaintiffs PCS Phosphate Company, Inc, and PCS Administration (USA) Inc.*
>
> *K&L Gates, by Nathan A. Huff, Lindsay S. Bishop, Jason L. Richey, John L. Gavin, and Daniel McClurg for Defendant Jacobs Engineering Group, Inc.*

*Mullins Duncan Harrell & Russell, PLLC by Allison Mullins, Alan W. Duncan, and Tyler Nullmeyer for Defendant Buss Chemtech AG.*

Houston, Judge.

## I.      BACKGROUND

4.      The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. *See Taylor v. Bank of Am., N.A.*, 382 N.C. 677, 679 (2022). Instead, for background, the Court summarizes the complaint's factual allegations that are most relevant to the Court's decision and accepts the factual, non-conclusory allegations as true for purposes of this Order and Opinion. *Estevez v. C&S Com., LLC*, 2025 NCBC LEXIS 166, at *1 (N.C. Super. Ct. Nov. 25, 2025).

5.      Plaintiffs are Delaware corporations with principal places of business in North Carolina. (ECF No. 42, ¶ 3). While PCS Phosphate produces phosphate products for use as "ingredients in fertilizers, livestock and poultry feed, and industrial applications," (ECF No. 42, ¶ 9), PCS Administration (USA), Inc.'s scope of business is not alleged in the amended complaint, (*see generally* ECF No. 42).[1]

6.      Defendant Jacobs Engineering Group, Inc. is a Delaware corporation with its principal place of business in Texas. (ECF No. 42, ¶ 4). Jacobs "provides engineering, technical, professional and construction services, as well as scientific

---

[1] Though Plaintiffs define themselves collectively in the amended complaint as "PCS," thereby engaging in obfuscatory group pleading, the allegations at a minimum make clear that the two Plaintiffs are separate entities. *See Britcher v. Assur. Grp., LLC*, 2025 NCBC LEXIS 150, at *10–12 (N.C. Super. Ct. Nov. 4, 2025) (requiring re-pleading in light of improper "group pleading"); *Baker v. Hobart Fin. Grp.*, 2023 NCBC LEXIS 45, at *4–5, 9–10 (N.C. Super. Ct. Mar. 22, 2023) (same).

and specialty consulting for a broad range of clients globally, including companies, organizations, and government agencies." (ECF No. 42, ¶ 14).

7. On 25 May 2017, PCS Administration and Jacobs entered into an Agreement for the Supply of Engineering and Professional Services, (ECF No. 42.1 at 4–68),[2] whereby PCS Administration and Jacobs agreed that Jacobs would provide certain engineering services in connection with the construction of an anhydrous hydrogen fluoride ("**AHF**") plant in Aurora, Beaufort County, North Carolina. (ECF No. 42, ¶¶ 1, 14).

8. The only two entities identified on the face of the document, and the only two signatories, as parties to that contract are (i) "PCS Administration (USA), Inc[.]" (defined as the "Company") and (ii) "Jacobs Engineering Group Inc." (defined as the "Supplier"). (ECF No. 42.1 at 4–6 (reflecting the names of, and signatures on behalf of, only those two entities as parties)).

9. PCS Administration contracted with Jacobs "based on [Jacobs's] representations of prior extensive experience working with AHF and similar processes." (ECF No. 42, ¶ 14).

10. After the original agreement was signed, on 28 July 2017, unidentified representatives of Jacobs presented a Proposal for Design and Estimating Services

---

[2] The agreement at issue is attached to the amended complaint and is properly considered in resolving the motion. *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citation omitted); *Packard v. Sei Priv. Trust Co.*, 2025 NCBC LEXIS 69, at *7–8 (N.C. Super. Ct. June 10, 2025) (citation omitted). The agreement, as amended, is a compilation of various non-consecutively numbered and unnumbered documents in a single PDF filing. Thus, the Court's page number citations with respect to ECF No. 42.1 are to the linear page number, treating the Exhibit 1 cover sheet (i.e., page 1 of the PDF file) as page 1.

form in which Jacobs represented that its "project team also include[d] design professionals with extensive experience working with Anhydrous Hydrogen Fluoride (AHF) and similar processes" and that certain of its identified team members were "the 'Best' in our industry." (ECF No. 42, ¶ 17).

11.    Effective 1 January 2018, PCS Administration and Jacobs signed an amendment, whereby the parties amended the original agreement to redefine the terms "Company Affiliates" and "Company Affiliate" to mean "the Persons listed in Exhibit B" to the original agreement and "any other Person that has Nutrien Ltd. as its ultimate parent company." (ECF No. 42.1 at 2, § 1(a)). In turn, Exhibit B lists PCS Phosphate, among other PCS entities, though PCS Phosphate did not sign the amendment. (ECF No. 42.1 at 47 (Ex. B at 1)). The Court refers to the final agreement, as amended, as the "**Agreement**" or the "**PCS Administration-Jacobs Agreement**."

12.    Under the Agreement, PCS Administration and Jacobs agreed that Jacobs would "sell to the Company[3] the Services as may be ordered by the Company pursuant to a duly issued purchase order." (ECF No. 42.1 at 15–16, § 3.1).

13.    The parties also agreed that "[e]ach of the Company Affiliates may purchase Services from [Jacobs] hereunder for their own account on the same terms and conditions as are applicable to [PCS Administration] by issuance of a Purchase Order including the notation referencing this Agreement on each Purchase Order as set

---

[3] The "Company" is defined in the agreement as "the party designated as 'Company' in the Key Terms," which, in turn, identifies the "Company" as "PCS Administration (USA), Inc[.]" (ECF No. 42.1 at 9, § 1.1(l); ECF No. 42.1 at 4 at "Key Terms").

forth in Section 3.1." (ECF No. 42.1 at 14, § 2.2). To facilitate such an arrangement, PCS Administration and Jacobs agreed that the terms of the "Agreement shall apply to such Company Affiliate with respect to such [future] Purchase Order" only "[f]ollowing acceptance of a Company Affiliate's Purchase Order." (ECF No. 42.1 at 14, §§ 2.2–2.3).

14. Plaintiffs do not allege, however, that either PCS Administration or Jacobs was authorized to bind PCS Phosphate as a party to the Agreement or that PCS Phosphate agreed at the time of the contract to be bound by its terms. (*See generally* ECF Nos. 42 and 42.1).

15. Among other things, as to Jacobs's scope of work under the Agreement, the parties agreed that Jacobs would provide at least the following work, which, "[e]xcept as otherwise provided," was "intended and designed to effect a complete and operable Scope of Work capable of meeting the testing, performance and operating requirements":

> a. Development of overall Site Plan and General Arrangement drawings
> b. Equipment specifications and bid documents for all process equipment, tanks and vessels not supplied by [Buss] based on [Buss] datasheets
> c. Provision of electrical power to all rotating and non-rotating electrical loads within the ISBL scope
> d. Instrumentation and control systems for the ISBL scope of work
> e. All structural systems to support the process blocks, storage tanks, and pipe bridges
> f. All piping systems including all process and utility piping

(ECF No. 42, ¶¶ 21–22 (alterations in original) (emphasis removed)).

16. The Agreement contemplates that Company Affiliates might issue purchase orders to Jacobs, with each individual purchase order outlining specific engineering services for Jacobs to then complete for the plant. (ECF No. 42.1 at 15, § 3.1).

17. However, the Agreement also provides that, "[e]xcept as specifically provided in this Agreement, the provisions of this Agreement are for the exclusive benefit of the Parties [i.e., PCS Administration and Jacobs] and no other Person shall be a third party beneficiary or have any rights by virtue of this Agreement." (ECF No. 42.1 at 41–42, § 20.4).

18. Regardless, PCS Phosphate ultimately "issued multiple Purchase Orders to Jacobs," for which Jacobs received and accepted payment. (ECF No. 42, ¶ 19).

19. Plaintiffs assert that PCS Phosphate issued these purchase orders to Jacobs only after Jacobs represented to "PCS" on 15 August 2019 that Jacobs had a "'highly qualified project team' to provide 'complete in-house turnkey services'" for the project and that its team included "design professionals with extensive experience working with Anhydrous Hydrogen Fluoride (AHF) and similar processes." (ECF No. 42, ¶ 18). However, "none of Jacobs's engineering team had any previous experience working on an AHF plant." (ECF No. 42, ¶ 20).

20. Though PCS Phosphate issued purchase orders to Jacobs and Jacobs provided services pursuant to those purchase orders, PCS Phosphate was not a signatory or a named party to the Agreement. (*See generally* ECF No. 42.1).

21. Construction began on the AHF plant in February 2020, and the plant was "scheduled to be fully operational by June 17, 2022." (ECF No. 42, ¶ 35). Once

operational, the AHF plant was expected to produce "at least 40,000 metric tons of AHF per year," and with this in mind, Plaintiffs entered into a separate agreement with another company, Arkema, Inc., through which Arkema would "purchase the AHF produced at the AHF Plant once operational for a period of up to thirty years." (ECF No. 42, ¶ 13).

22. Despite the information and personnel identified in Jacobs's various written proposals, "none of the process engineers identified [by Jacobs] performed any work on the detailed engineering for the [AHF Plant]," and "none of Jacobs' engineering team had any previous experience working on an AHF plant." (ECF No. 42, ¶ 20).

23. Plaintiffs contend that the engineers who ultimately designed and worked on the AHF Plant lacked "the knowledge or experience required to successfully engineer" the AHF Plant, which resulted in the use of unsuitable or improper materials, designs, adhesives, coatings, packing materials, storage, piping, coatings, metallurgy, instrumentation, and other issues with work provided by Jacobs and Buss. (ECF No. 42, ¶¶ 20, 37(a)–(d), 38(a)–(n), 39(a)–(n), 40(a)–(f), and 43).

24. In turn, due to "numerous design and engineering defects and failures," construction on the plant was delayed by several years and was not completed by the original June 2022 completion date. Instead, construction continued through at least the date the amended complaint was filed. (ECF No. 42, ¶¶ 2, 36). Because of the delays, Plaintiffs were "forced to agree to future reductions in price for the AHF" to be produced and sold to Arkema, as a result of which Plaintiffs assert that they "will

never be able to earn a profit on the sale of AHF produced at the AHF Plant." (ECF No. 42, ¶ 13).

25.    Thus, Plaintiffs commenced this action in Beaufort County Superior Court on 27 February 2025, before filing an amended complaint on 20 June 2025. (ECF Nos. 3 and 42).

26.    In their amended complaint, Plaintiffs assert three causes of action against Jacobs: breach of contract, breach of warranty, and professional negligence. (ECF No. 42, ¶¶ 50–80).

27.    The case was designated as a mandatory complex business case on 7 April 2025 and assigned to the undersigned judge on 21 August 2025. (ECF Nos. 2 and 66).

28.    The motion has been fully briefed and, following a hearing at which counsel for the parties were present, is ripe for resolution.

## II.    ANALYSIS

29.    In ruling on a motion to dismiss for failure to state a claim, the Court must determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted). Dismissal is appropriate if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Id.* (citation omitted).

30. The Court treats the well-pleaded factual allegations as true and view them "in the light most favorable to the non-moving party." *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted). Further, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers" regardless of the party that presents them. *Oberlin*, 147 N.C. App. at 60 (citation omitted). The Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citations omitted).

31. Jacobs asserts that each of Plaintiffs' three causes of action should be dismissed and also argues that Plaintiffs' request for consequential damages and lost profits is barred under the Agreement. (*See generally* ECF Nos. 57 and 58). The Court addresses each argument in turn.

## A. <u>Breach of Contract—PCS Phosphate</u>

32. "To state a claim for breach of contract, the complaint must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." *Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison*, 281 N.C. App. 312, 332 (2022) (citation and internal quotation marks omitted); *Valle Cay Prop. Owners Ass'n, Inc. v. Slocum Mt. Real Est., LLC*, 2026 N.C. App. LEXIS 91, at *5 (Feb. 4, 2026) ("The elements of a breach of contract claim are (1) existence of a valid contract and (2) breach of the contract's terms.").

33. Here, as to the Agreement, Plaintiffs assert in relevant part that both "Plaintiffs entered into the Jacobs . . . Agreement[] with [Jacobs], which constitute[s] [a] valid and enforceable contract[]" and that Jacobs "breached [its] performance and other obligations under the Agreement[]." (ECF No. 42, ¶¶ 51–52).

34. While it is listed as a "Company Affiliate" in the Agreement, PCS Phosphate is not identified in the Agreement as a party to that contract, nor is it a signatory to the Agreement—as Plaintiffs concede. (ECF No. 62 at 5–6; *see generally* ECF No. 42.1). Nonetheless, Plaintiffs assert that, because Jacobs "agreed to provide services not only to PCS Administration, but also to other PCS-related entities including PCS Phosphate," the allegations in the amended complaint "alone are sufficient to state claims for breach of contract and warranty by PCS Phosphate." (ECF No. 62 at 6).

35. Jacobs, on the other hand, argues that, based on the plain language of the contract, PCS Phosphate was not a party to the Agreement and that its breach of contract cause of action premised on its status as a party to that contract necessarily fails as a matter of law. (ECF No. 58 at 6–8).

36. "The general rule is that one who is not a party to a contract may not maintain an action for its breach." *Matternes v. City of Winston-Salem*, 286 N.C. 1, 12 (1974); *Chicago Title Ins. Co. v. Holt*, 36 N.C. App. 284, 288–89 (1978) ("Subject to certain exceptions not relevant here, one who is not a party to a contract may not maintain a claim for relief for its breach." (citations omitted)).

37. Here, while the Agreement, as amended, makes clear that PCS Phosphate is one of the "Company Affiliates" who "may purchase Services from [Jacobs]

hereunder for their own account . . . by issuance of a Purchase Order," it is equally apparent that the potential for a *future* purchase order does not make Company Affiliates like PCS Phosphate parties to the *current* Agreement. Rather, the Agreement makes clear that the terms of the "Agreement shall apply to such Company Affiliate with respect to such [future] Purchase Order" only "following acceptance of a Company Affiliate's Purchase Order[.]" (ECF No. 42.1 at 14, §§ 2.2–2.3).

38.     In essence, the Agreement contemplates that if Company Affiliates like PCS Phosphate enter a future agreement with Jacobs by issuing a purchase order, the terms of the Agreement will be incorporated into or otherwise apply to that future agreement. (ECF No. 42.1 at 14, §§ 2.2–2.3). That does not, however, make PCS Phosphate a "party" to the PCS Administration-Jacobs Agreement.

39.     There is also no indication in the Agreement itself or in the complaint that PCS Administration was otherwise authorized (at the time of execution or amendment) to bind PCS Phosphate as a party. *Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 438 (1977) ("It is a fundamental principle of contract law that parties to a contract may bind only themselves and that the parties to the contract may not bind a third person who is not a party to the contract in absence of his consent to be bound." (citation omitted)); *see Barrow v. Murphrey*, 95 N.C. App. 738, 741 (1989).

40.     Notwithstanding Plaintiffs' allegation that PCS Phosphate is a party to the PCS Administration-Jacobs Agreement, it is not, and Plaintiffs' allegations may not contradict the plain language of the Agreement. *Moch*, 251 N.C. App. at 206.[4]

41.     In short, PCS Phosphate was not a party to the Agreement, and had no enforcement rights under the Agreement when it was signed. PCS Phosphate's subsequent issuance of purchase orders to Jacobs does not retroactively make PCS Phosphate a party to the PCS Administration-Jacobs Agreement, even if its purchase orders adopt and incorporate the same *terms*.

42.     Accordingly, to the extent that PCS Phosphate's breach of contract cause of action is premised upon PCS Phosphate's purported status as a party to the overall PCS Administration-Jacobs Agreement (as opposed to its purchase orders with Jacobs that might have incorporated the terms of the Agreement), the Court **GRANTS** Jacobs's motion to dismiss.

---

[4] Plaintiffs also suggest in their briefing that PCS Phosphate was a third-party beneficiary to the Agreement. (ECF No. 62 at 7). However, there are no nonconclusory, factual allegations in the amended complaint that this particular Agreement "was entered into for" PCS Phosphate's direct—or even incidental—benefit, as opposed to providing a mechanism whereby the terms or parameters would apply to future agreements *if* purchase orders were issued. Rather, Plaintiffs plainly allege in their complaint only that PCS Phosphate *was a party* to the Agreement, which necessarily would preclude third-party beneficiary status. *See Metric Constructors, Inc. v. Indus. Risk Insurers*, 102 N.C. App. 59, 63 (1991); *Griffing v. Gray, Layton, Kersh, Solomon, Furr & Smith, P.A.*, 293 N.C. App. 243, 252–53 (2024) ("[T]o assert rights under a contract as a third-party beneficiary, the third party 'must show: (1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the third party.' . . . 'A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person.' . . . '[T]he determining factor as to the rights of a third-party beneficiary is the intention of the parties who actually made the contract. The real test is said to be whether the contracting parties intended that a third person should receive a benefit which might be enforced in the courts.'" (citations omitted)).

43. This may, however, prove to be a distinction with little difference because, inasmuch as PCS Phosphate asserts a breach of contract cause of action arising from its purchase orders issued to Jacobs, PCS Phosphate has adequately stated a claim for breach of contract.

44. Specifically, Plaintiffs allege that (i) "PCS Phosphate issued multiple Purchase Orders to Jacobs, which were accepted by Jacobs and set out Jacobs's scope of work" and (ii) "Jacobs failed to properly perform the services required under the Purchase Orders." (ECF No. 42, ¶ 19). Plaintiffs further identify various factual circumstances that they contend were "engineering failures" occasioned by "Jacobs's and Buss's"[5] noncompliance (i.e., alleged breaches), including at least thirty-eight (38) separate paragraphs specifying allegedly improper, noncompliant, or otherwise unsuitable materials, designs, adhesives, coatings, packing materials, storage, piping, coatings, metallurgy, instrumentation, or other issues with work provided by Jacobs (or Buss). (ECF No. 42, ¶¶ 37(a)–(d), 38(a)–(n), 39(a)–(n), and 40(a)–(f)). Plaintiffs further allege that these failures "resulted in significant costs and delays." (ECF No. 42, ¶¶ 37–40).

---

[5] While these allegations again constitute improper group pleading and fail to specify whether the allegations are specifically against Buss or Jacobs, the allegations plainly identify the alleged conduct in a manner sufficient to permit Jacobs to evaluate the conduct at issue, to determine whether it was involved in or responsible for the conduct and alleged failures at issue, and to permit it to respond accordingly in its answer. *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442–43 (1988) ("Under the notice theory of pleading, a statement of a claim is adequate if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand its nature and basis and to file a responsive pleading. . . . Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." (citations omitted)).

45. While each Plaintiffs' first cause of action for breach of contract is premised exclusively upon breaches of the "Agreements" and implicitly references the PCS Administration-Jacobs Agreement and the PCS Administration-Buss Agreement, the term "Agreements" is undefined in the complaint, and the accepted purchase orders—as alleged—appear to constitute agreements. (ECF No. 42, ¶ 19).

46. Moreover, though Plaintiffs do not expressly reference purchase orders under the "breach of contract" heading for their first cause of action, the Court considers the substance of the complaint as a whole and whether the facts in the body of the complaint sufficiently allege a claim under any theory, "whether properly labeled or not." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987) (citation omitted); *Buchanan v. Hunter Douglas, Inc.*, 87 N.C. App. 84, 86 (1987) ("If a plaintiff's claim is mislabeled in his complaint, that fact will not, in and of itself, prove fatal to the action if critical facts are sufficiently pled *in the body of the complaint* that will give the adverse party notice of the assertions against him.*"* (emphasis added)); *see also Robinson v. Forest Creek Ltd. P'ship*, 213 N.C. App. 593, 596 n.2 (2011) ("As Plaintiffs' complaint gives sufficient notice of the wrong alleged . . . Plaintiffs' incorrect choice of legal theory does not warrant summary judgment so long as Plaintiffs' allegations 'are sufficient to state a claim under some legal theory.'" (citation omitted)).

47. Considering the complaint accordingly, the Court concludes that PCS Phosphate adequately, if barely, alleges a breach of contract claim with respect to its

purchase order agreements. (ECF No. 42, ¶¶ 19, 37–40); *see Dan King*, 281 N.C. App. at 332; *Valle Cay*, 2026 N.C. App. LEXIS 91, at \*5.

48.     Though Jacobs suggests that the complaint is deficient because the purchase orders were not attached to the complaint, there is no heightened pleading standard for a breach of contract claim, and a "plaintiff's complaint must merely 'give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]'" *AYM Techs., LLC v. Rodgers*, 2018 NCBC LEXIS 14, at \*52–53 (N.C. Super. Ct. Feb. 9, 2018) (quoting N.C. R. Civ. P. 8(a)).

49.     Thus, the "notice-pleading standard does not require a plaintiff to attach a written contract to, or specifically identify its terms in, a complaint." *Beam v. Sunset Fin. Serv.*, 2019 NCBC LEXIS 56 at \*27–28 (N.C. Super. Ct. Sep. 3, 2019) (citing *Wray v. City of Greensboro*, 370 N.C. 41, 54 (2017)).

50.     Though the complaint is full of conclusory allegations and group pleading, Jacobs does not argue that it is unable to understand the allegations lodged against it, (*see generally* ECF No. 58), and the Court cannot conclude "beyond a doubt that [PCS Phosphate] could not prove any set of facts to support [its] claim which would entitle [it] to relief" with respect to the purchase orders. *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 480 (2004) (citation omitted).

51.     Thus, the Court **GRANTS** the motion to the extent it seeks dismissal of PCS Phosphate's breach of contract cause of action premised upon a breach of the PCS Administration-Jacobs Agreement, such that it is **DISMISSED with prejudice**.

However, to the extent the cause of action is premised upon Jacobs's alleged breach of purchase order agreements between Jacobs and PCS Phosphate, the Court **DENIES** the motion.

52. With the purchase orders not having been provided to the Court, the Court at this motion-to-dismiss stage makes no determination as to whether the purchase orders, if they exist, incorporate the terms of the Agreement or whether they otherwise permit PCS Phosphate and Jacobs to invoke or rely upon the terms of the Agreement as establishing certain rights and obligations under the purchase orders.

### B. Breach of Contract—PCS Administration

53. As to PCS Administration's breach of contract cause of action, Jacobs does not argue that Plaintiffs have failed to allege the existence of a contract between Jacobs and PCS Administration, and it could not reasonably do so. Plaintiffs plainly allege the existence of the Agreement, to which PCS Administration and Jacobs are named parties, (ECF No. 42, ¶¶ 15, 22–24, 51), and allege that Jacobs breached the terms of the Agreement, identifying various alleged breached by Jacobs, (ECF No. 42, ¶¶ 36–40, 52–53). *Dan King*, 281 N.C. App. at 332 (addressing elements of breach of contract claim).

54. Instead, Jacobs argues that PCS Administration has failed to allege that it suffered damages because the only potential damages arise from harm to the AHF Plant, which is owned and operated by PCS Phosphate and in which PCS Administration asserts no interest. (ECF No. 58 at 8–9).

55. PCS Administration counters that it has adequately pleaded damages, pointing to "expectancy damages" it has allegedly experienced along with other less specific costs. (ECF No. 62 at 9–10).

56. Under North Carolina law, in a breach of contract action, "proof of an injury to a party's legal rights entitles that party to nominal damages at least." *Cole v. Sorie,* 41 N.C. App. 485, 490 (1979) (citation omitted); *Delta Env't Consultants of N.C., Inc. v. Wysong & Miles Co.,* 132 N.C. App. 160, 171–72 (1999) ("The principle that the violation of a legal right entitles a party to at least nominal damages has been applied to establish that in a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least." (citations and internal quotation marks omitted)).

57. In this action, Plaintiffs allege that "PCS"—defined to include both PCS Phosphate and PCS Administration—incurred "significant costs . . . to correct Defendants' defective work," that they have "suffer[ed] damages due to the Project's inability to operate," that "additional design and engineering failures" are ongoing, that Plaintiffs are continuing to "incur[] correct costs and lost profits as a result of those failures," and that Plaintiffs have lost profits and incurred "excess costs, and project delays," among other things. (ECF No. 42, ¶¶ 2, 37–40, 55, 57, 64–66, 80).

58. While it is certainly possible that Jacobs will be able to demonstrate that there has been no breach of the Agreement and that PCS Administration has not suffered damages, at this early pleading stage of the case, Plaintiffs' allegations are sufficient to state a valid claim by PCS Administration for breach of contract against

Jacobs. *See Dan King*, 281 N.C. App. at 332; *Valle Cay*, 2026 N.C. App. LEXIS 91, at *5.

59. Accordingly, the Court **DENIES** Jacobs's motion to dismiss PCS Administration's breach of contract cause of action.

## C. Breach of Warranty—PCS Administration and PCS Phosphate

60. Each Plaintiff also asserts a breach of warranty cause of action against Jacobs, suggesting that Jacobs breached "express warranties of [its] work at the AHF Plant" made "[i]n [its] Agreement[] with Plaintiffs." (ECF No. 42, ¶ 60; *see generally* ECF No. 42, ¶¶ 59–67).

61. According to Plaintiffs, the alleged warranties all arise from provisions in the Agreement that

> a. Jacobs's services would effect a complete and operable Scope of Work capable of meeting the testing, performance and operating requirements to the extent such are specifically set forth in the Scope of Work;
>
> b. Jacobs would perform the Services in accordance with the standard of care, skill and diligence expected of Persons performing services of a similar type and nature and in an efficient and workmanlike manner;
>
> c. Jacobs would use its best skill and attention consistent with the best quality and the generally accepted professional standards of the engineering profession;
>
> d. Jacobs would perform the Services in the most expeditious and economical manner consistent with the interest of [PCS] and in accord with the Standard of Care, which shall be defined as those professional standards of care, diligence and skill prevailing among major engineering firms engaged in similar Services under similar conditions and in similar locations; and

e. Jacobs's documents would be complete in detail and suitable for construction by a competent construction, and be free from material defects and deficiencies.

(ECF No. 42, ¶¶ 52(a)–(e) and 62(a)–(e); *see* ECF No. 42, ¶¶ 22–24; ECF No. 42.1 (alteration in original)).

62. In their briefing, both sides address the breach of warranty argument in only a perfunctory fashion, largely treating it as part and parcel of the breach of contract cause of action. (*See generally* ECF No. 58 at 6–8; ECF No. 62 at 5–6, 10 (containing minimal references to warranties); ECF No. 72 at 3 (one reference to warranties)).[6]

63. Ultimately, "[a] warranty, express or implied, is contractual in nature." *Christie v. Hartley Const., Inc.*, 367 N.C. 534, 540 (2014) (citation and internal quotation marks omitted).

64. As to PCS Administration, the complaint identifies the specific contract at issue (the Agreement), identifies the various warranties in the PCS Administration-Jacobs Agreement, asserts that Jacobs breached those warranties, and alleges that PCS Administration has suffered damages as a result of the alleged breaches. (ECF

---

[6] Though Jacobs asserts that "a breach of warranty claim requires a showing that 'an express warranty was made [and] that the warranty was relied upon by the plaintiff,'" that requirement is in the context of an express warranty made pursuant to the Uniform Commercial Code, and the case that Jacobs cites for this proposition is one involving the sale of goods and specifically quotes N.C. Gen. Stat. § 25-2-313(1)(a) (2021). (ECF No. 58 at 11 (quoting *Ascot Corp., LLC v. I&R Waterproofing, Inc.*, 286 N.C. App. 470, 475 (2022))). Plaintiffs' breach of warranty arguments, however, are not premised upon the sale of goods and are premised only upon alleged breaches of the service provisions of the Agreement. (ECF No. 42, ¶ 62(a)–(e); *see* ECF No. 42, ¶¶ 22–24). Regardless, Jacobs's sole argument as to the breach of warranty cause of action is that "PCS Phosphate's warranty claim [is] deficient because the alleged warranties exclusively arise from the Jacobs Agreement." (ECF No. 58 at 7–8).

No. 42, ¶¶ 22–24, 59–67). Thus, regardless of its framing, PCS Administration has adequately stated a claim premised upon Jacobs's alleged breaches of the contractual warranties contained within the Agreement. *See Dan King*, 281 N.C. App. at 332; *Valle Cay*, 2026 N.C. App. LEXIS 91, at *5.

65.     However, the same is not true of PCS Phosphate. Unlike with its breach of contract cause of action, which sufficiently alleges the existence of purchase orders and breaches of those purchase orders, the breach of warranty cause of action is tied exclusively to the terms of the Agreement. (ECF No. 42, ¶¶ 59–67).

66.     Since PCS Phosphate is not a party to, or direct beneficiary of, the PCS Administration-Jacobs Agreement, it may not sue to enforce warranties or other contract terms under that particular agreement. *Matternes*, 286 N.C. at 12; *Chicago Title*, 36 N.C. App. at 288–89.

67.     PCS Phosphate also does not otherwise allege that it incorporated the terms of the PCS Administration-Jacobs Agreement into the as-accepted purchase orders or that its purchase orders to Jacobs even contained warranties.[7] (ECF No. 42, ¶¶ 16, 19).

68.     Thus, construing the allegations of the complaint in the light most favorable to Plaintiffs, the Court **DENIES** the motion to dismiss as to PCS Administration's

---

[7] PCS Phosphate asserts that it is a party to the PCS Administration-Jacobs Agreement and that the terms of the Agreement (including, presumably, the warranties) are to be included in future purchase orders. (ECF No. 42, ¶¶ 16, 59–67). The complaint does not, however, assert the existence of, or otherwise account for, warranties outside of the Agreement or contemplate any warranty that does not arise from PCS Phosphate's perceived status as a party to the Agreement. (ECF No. 42, ¶¶ 1, 14).

breach of warranty cause of action but **GRANTS** the motion as to PCS Phosphate's breach of warranty cause of action, which is **DISMISSED without prejudice**.[8]

### D. Professional Negligence—PCS Administration and PCS Phosphate

69.     Jacobs next moves to dismiss Plaintiffs' cause of action for professional negligence, contending that it is barred by the economic loss rule and, as to PCS Administration, that it has not alleged damages from Jacobs's conduct. (ECF No. 58 at 9–11).

70.     To sufficiently plead a claim of professional negligence, a plaintiff must allege three elements: "(1) the nature of the defendant's profession; (2) the defendant's duty to conform to a certain standard of conduct; and (3) a breach of the duty proximately caused injury to the plaintiffs." *Greene v. Pell & Pell L.L.P.*, 144 N.C. App. 602, 604 (2001) (internal citations omitted).

71.     Here, Jacobs does not dispute that Plaintiffs have adequately alleged the first two elements of such a claim on behalf of both Plaintiffs, nor does it dispute that they have pleaded the third as to PCS Phosphate.[9] Thus, the Court focuses on

---

[8] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court . . . ." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013). Here, the Court has carefully considered whether dismissal with or without prejudice is appropriate and has exercised its discretion accordingly.

[9] Indeed, Plaintiffs (i) allege that Jacobs and its representatives are professional engineers, (ii) specify the standards of care that Jacobs contractually agreed to undertake *and* that it allegedly owed outside the terms of the contract, and (iii) assert that Jacobs breached the duty, resulting in injury to Plaintiffs. (ECF No. 42 at 1 & ¶¶ 1, 8, 21–24, 36–40, 76–77, 79; *see also Greene*, 144 N.C. App. at 604 (2001).

Jacobs's two limited arguments: (i) lack of injury to PCS Administration and (ii) the economic loss rule.

### a. Alleged Injury to PCS Administration

72. As its first contention, Jacobs reiterates in footnote 2 of its supporting brief the same argument that it makes with respect to PCS Administration's breach of contract cause of action: that "PCS Adminis[t]rat[i]on's professional negligence claim should likewise be dismissed because the Amended Complaint does not allege that PCS Administration has been injured or otherwise incurred damages as a result of Jacobs' alleged actions." (ECF No. 58 at 9 n.2 (citing its earlier-briefed argument concerning damages)).

73. As explained above, however, Plaintiffs allege that they both have incurred costs to correct defective work, experienced harm based on an inability to operate the AHF Plan, and have otherwise experienced project delays. (ECF No. 42, ¶¶ 2, 37–40, 55, 57, 64–66, 80).

74. While it may well be that only PCS Phosphate sustained these alleged harms and that PCS Administration sustained none, Plaintiffs have pleaded facts suggesting that both Plaintiffs have experienced harm. *Pyco*, 321 N.C. at 442–43 (addressing notice pleading).

75. Unlike a motion for summary judgment, a Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the 'the law of a claim, not the facts which support it,'" such that "[a]t the dawn of the case, courts should not discard a complaint 'unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts

which could be proved in support of the claim.'" *Est. of Graham v. Lambert*, 385 N.C. 644, 656 (2024) (citations omitted).

76. At this stage, Plaintiffs adequately allege damages to PCS Administration, and Jacobs may test the veracity of those allegations through the discovery process before seeking summary judgment, if appropriate. *Id.*

b. Economic Loss Rule—PCS Administration and PCS Phosphate

77. Though it does not otherwise dispute the sufficiency of Plaintiffs' allegations to state a claim for professional negligence, Jacobs contends that the economic loss rule bars Plaintiffs' cause of action because "Plaintiffs are commercial owner/developer entities that chose to negotiate contracts to allocate potential contract obligations and remedies with Jacobs," thereby barring a tort claim arising from the same conduct. (ECF No. 58 at 10).

78. In opposition, Plaintiffs argue that the rule does not apply because (i) engineers such as Jacobs have an extra-contractual duty of care to Plaintiffs and (ii) Plaintiffs have incurred "damage to equipment and materials not supplied by Jacobs." (ECF No. 62 at 12–15).

79. "North Carolina's economic loss rule requires negligence claims to be based upon the violation of an extra-contractual duty imposed by operation of law[.]" *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 376 N.C. 54, 55 (2020). Thus, "[t]he economic loss doctrine prohibits recovery for economic loss in tort." *Ascot Corp.*, 286 N.C. App. at 490 (quoting *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 884 (2004) (internal citations and quotation marks omitted)). As a result, when a party

breaches a duty imposed by contract, the terms of the contract generally set the standard by which the non-breaching party may recover, such that the non-breaching party may not recover in tort for harm governed by the contract. *See id.*; *see also Crescent Univ.*, 376 N.C. at 58–63.

80. However, the economic loss rule does not operate to bar a tort claim when there is an "extra-contractual duty imposed by law.*" Crescent Univ.,* 376 N.C. at 59. Thus, our courts have recognized that North Carolina law is "in accord with" case law from numerous other states recognizing that "[t]he economic loss rule does not bar a cause of action against a professional for his or her negligence even though the damages are purely economic in nature[.]" *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *53–54 (N.C. Super. Ct. Sep. 28, 2018) (citation omitted) (collecting cases).

81. Though Jacobs cites *Crescent* for the contention that "sophisticated commercial owners who control the means of contracting, like Plaintiffs, will not be afforded extra contractual remedies beyond those they negotiate for," (ECF No. 58 at 9–10), *Crescent* does not stand for this proposition. Rather, as the Supreme Court made clear, that case addresses whether "a commercial property owner who contracts for the construction of a building, and thereby possesses a bargained-for means of recovery against a general contractor, may nevertheless seek to recover in tort for its economic loss from a subcontracted manufacturer of building materials with whom the property owner does not have contractual privity." *Crescent Univ.*, 376 N.C. at 55.

82. As the Supreme Court affirmed, the answer is that the property owner may not do so where it "has not alleged or forecast evidence showing the breach of any separate or distinct extra-contractual duty imposed by law." *Id*. at 58 (quoting the Business Court's opinion). But where a plaintiff *does* allege the existence of a separate or distinct extra-contractual duty, the economic loss rule does not bar the claim. *Id*. at 59; *Provectus*, 2018 NCBC LEXIS 101, at *53–54.

83. As pertinent to this case, North Carolina recognizes an extra-contractual duty imposed by law on certain professional service providers—"and engineers in particular"—who are "are 'professionals' with special knowledge and skill and corresponding professional duties because of that knowledge and skill." *Wright Constr. Servs. v. Hard Art Studio, PLLC*, 275 N.C. App. 972, 975 (2020) ("This, in turn, imposes on an architect or engineer 'a duty to those who must reasonably rely upon his professional performance.'" (citing *Davidson & Jones, Inc. v. New Hanover Cnty.*, 41 N.C. App. 661, 667 (1979)) (internal citations omitted)).

84. Thus, "engineers performing work on a construction project owe a duty of care to those who reasonably rely on their work, including the builder on the project." *Id*. at 972.

85. This duty exists independent of the parties' contractual duties, and "as is the case with all legal duties, the 'violation of that duty is negligence.'" *Id*. at 975 (citing *Shoffner Indus., Inc. v. W. B. Lloyd Constr. Co.*, 42 N.C. App. 259, 265 (1979)).

86. In this case, Jacobs's name is "Jacobs Engineering Group, Inc.," and Plaintiffs clearly allege that (regardless of whether via the Agreement or the

purchase orders) they engaged Jacobs "as the engineer for the AHF Plant," that its representatives were purported to have "prior extensive experience" in engineering for AHF and similar processes, and that the services at issue in this case were engineering services to be provided by or on behalf of Jacobs. (ECF No. 42 at 1 & ¶¶ 1, 8, 21–24, 36–40, 76–77, 79).

87.    These facts sufficiently allege that Jacobs's and its representatives' services were professional engineering services that would not be subject to the economic loss rule, such that Jacobs would owe an extra-contractual duty of care to parties reasonably relying on its work. *Wright*, 275 N.C. App. at 975.

88.    Plaintiffs further assert, in relevant part, as follows:

> 77. Jacobs agreed to perform its engineering services in accordance with the professional standards of care, diligence and skill prevailing among major engineering firms engaged in similar Services under similar conditions and in similar locations.
>
> 78. Buss agreed to perform its engineering services in accordance with the following "Standard of Care": those standards of care and diligence normally practiced by engineering and construction firms in the performance of design, procurement, construction, commissioning and testing services for a[n] anhydrous hydrofluoric acid production facility as of the Effective Date. These standards shall include at a minimum, those standards of care and diligence normally practiced by Engineer on its largest chemical production projects.
>
> 79. Jacobs and Buss negligently breached their duties of care to Plaintiffs when Jacobs and Buss failed to design and engineer the AHF Plant in accordance with generally accepted standards in the engineering profession and the standards of care set out in their Agreements.

(ECF No. 42, ¶¶ 77–79).

89. Considering these allegations and the remaining allegations in the complaint in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged facts demonstrating the existence of a professional duty of care owed by Jacobs independent of the contractual duties imposed by the Agreements and purchase orders. *See Alba v. Blue Cross & Blue Shield of N.C.*, 2021 N.C. App. LEXIS 93 at *10 (Apr. 6, 2021) ("[I]t is well established that although the duty owed by a defendant to a plaintiff may have sprung from a contractual promise made to another, the duty sued on in a negligence action is not the contractual promise but the duty to use reasonable care in affirmatively performing that promise. The duty exists independent of the contract." (quoting *White v. Collins Bldg., Inc.*, 209 N.C. App. 48, 51 (2011))); *see also Vista Horticultural, Inc. v. Johnson Price Sprinkle, PA*, 2024 NCBC LEXIS 20 at *8 (N.C. Super. Ct. Feb. 5, 2024) (concluding that claims of professional negligence were not barred by the economic loss rule because they were based on a duty owed "separate and apart from any duty owed under a contract" (quoting *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42 at *48 (N.C. Super. Ct. Nov. 3, 2011))).

90. Plaintiffs also argue that the economic loss rule does not apply here because the damages or harms at issue were to property other than the subject of the Agreement. (ECF No. 62 at 13–15); *see Ascot Corp.,* 286 N.C. App. at 490 (explaining that the economic loss doctrine does not bar a claim "where '[t]he injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the

subject of the contract'" (quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 82 (1978))); *but see Wachs Tech. Servs. v. Praxair Distrib.*, 2012 N.C. App. LEXIS 362 at \*9–10 (2012) (noting that "[t]he economic loss doctrine bars tort recovery for any type of damage that one would reasonably expect as a direct consequence of, or incidental to, the failure of the defective product").

91. As the Court determines that Plaintiffs have adequately alleged the existence of an extra-contractual duty owed by Jacobs, the Court need not, and does not, reach this second exception.

92. Accordingly, the Court **DENIES** Jacobs's motion to dismiss Plaintiffs' professional negligence cause of action.

### E. Consequential Damages—PCS Administration and PCS Phosphate

93. Next, Jacobs contends that Plaintiffs' requests for consequential damages and lost profits are barred and should be dismissed because the Agreement (i) contains certain limitations on liability precluding the recovery of consequential, incidental, indirect, special or punitive damages, among other things, absent a showing of willful misconduct by Jacobs, (ECF No. 42.1 at 35, § 16.1(B); ECF No. 58 at 12), and (ii) limits Jacobs's total aggregate liability "arising out of the performance or breach of th[e] Agreement" to "one-hundred percent (100%) of the purchase order value from which the liability arose" absent a showing of Gross Negligence (or other circumstances not applicable here), (ECF No. 42.1 at 37, § 16.5(e); ECF No. 58 at 14–15).

94. In the complaint, Plaintiffs assert that they "are entitled to recover their consequential damages and lost profits" because Jacobs's "acts and omissions constitute gross negligence," such that "exculpatory clauses in the agreements are void as against public policy." (ECF No. 42, ¶¶ 56, 65).

95. Responding to Jacobs, Plaintiffs reiterate these gross negligence assertions, contending that the exculpatory provision is invalid on public policy grounds and under applicable law, and also observe that, if PCS Phosphate is not a party to the Agreement, its requested damages are likewise not limited by the Agreement to which it is not a party. (ECF No. 62 at 15–20).

96. Under Rule 8(a)(2) of the North Carolina Rules of Civil Procedure, in negligence actions, "the pleading shall not state the demand for monetary relief, but shall state that the relief demanded is for damages incurred or to be incurred in excess of twenty-five thousand dollars ($25,000)." N.C. R. Civ. P. 8(a)(2).

97. Ultimately, a request for damages is not a cause of action but is a request for a remedy incidental to a cause of action. *Whalehead Props. v. Coastland Corp.*, 299 N.C. 270, 282–83 (1980) (discussing monetary damages as a remedy); *see Estevez v. C&S Com., LLC*, 2025 NCBC LEXIS 166 at *8 n.1 (N.C. Super. Ct. Nov. 25, 2025) (distinguishing a remedy from a cause of action).

98. This case is currently before the Court on a Rule 12(b)(6) motion to dismiss, (ECF No. 57), and Plaintiffs' causes of action before the Court are for (i) breach of contract, (ii) breach of warranty, and (iii) professional negligence, each of which the Court has resolved above.

99. Plaintiffs do not allege a cause of action for gross negligence against Jacobs, (*see generally* ECF No. 42), nor is there any requirement under the Agreement that there be an independent cause of action for gross negligence (or willful misconduct) to trigger the exceptions to the limitations on liability contained in the Agreement. (ECF No. 42.1 at 35, § 16.1(B); ECF No. 42.1 at 37, § 16.5(e); ECF No. 58 at 12–15).

100. As set forth above, other than PCS Phosphate's breach of contract and breach of warranty causes of action premised on its perceived status as a party to the PCS Administration-Jacobs Agreement, Plaintiffs have stated claims upon which relief can be granted. Plaintiffs are not required at this stage to further plead the specific details of their alleged damages, nor are they required to plead a cause of action, or establish an independent claim, for gross negligence or willful misconduct to potentially recover damages under the contracts.

101. At the Rule 12(b)(6) stage, Jacobs is not entitled to what would amount to a premature declaratory judgment or advisory opinion as to potential damages that Plaintiffs might or might not be able to prove. *See Brakebush Bros., Inc. v. Certain Underwriters at Lloyd's of London – Novae 2007 Syndicate*, 2021 NCBC LEXIS 98, at *41 (N.C. Super. Ct. Nov. 1, 2021) (concluding "that it is too early in this litigation to decide whether [the plaintiff] would be entitled to recover consequential damages if it ultimately prevails in this action" and denying motion to dismiss request for consequential damages).

102. Thus, as to PCS Administration, the Court **DENIES** Jacobs's motion.

103. Further, as to PCS Phosphate, considering that (i) PSC Phosphate is not a party to the PCS Administration-Jacobs Agreement, (ii) it remains to be determined what the specific provisions were of the purchase orders issued to Jacobs, and (iii) Jacobs's arguments are predicated entirely on the terms of the Agreement that might or might not be incorporated into those purchase orders, the Court also **DENIES** Jacobs's motion.

### III.    CONCLUSION

104. Therefore, in the exercise of judicial discretion where applicable, the Court hereby **GRANTS in part** and **DENIES in part** Jacobs's motion to dismiss as set forth above.

SO **ORDERED**, this 11th day of March 2026.

/s/ Matthew T. Houston
Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases